UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

BRENT NUSSBAUM,

        Plaintiff.

v.

UNITED STATES OF AMERICA,

        Defendant.

CASE NO. 2:23-02371-JLS-PD

**FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL**

I.  **INTRODUCTION**

Plaintiff Brent Nussbaum filed this action following a motor vehicle accident in which a United States Postal Service ("USPS") mail delivery truck rear-ended Plaintiff's parked vehicle. Plaintiff asserts a single claim against Defendant United States of America for negligence under the Federal Tort Claims Act ("FTCA").

The Court held a two-day bench trial on February 11 and 12, 2025. Thereafter, the parties filed Proposed Findings of Fact and Conclusions of Law. (Docs. 68–69.) Having considered the testimony of all four witnesses, all admitted exhibits, the parties' arguments at trial, and the parties' post-trial submissions, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure Rule 52.[1]

II. **FINDINGS OF FACT**

  **A. The Accident**

  1. The accident giving rise to this action (the "Accident") occurred around 12:00 p.m. on December 8, 2019, on Foothill Boulevard in La Cañada Flintridge, California. (Admitted Fact ¶ 4, Doc. 55; Trial Transcript, Volume I ("T1") at 48:12–14.) It had rained earlier that morning, so the roadway was slick and wet. (T1 at 37:2–5, 48:15–21.)

  2. Orlando Chavez, a USPS employee, was driving a USPS mail delivery truck on Foothill Boulevard at approximately 15 to 20 miles per hour when he saw a car in front of him straddling two lanes and slowing down. (Admitted Fact ¶ 6; T1 at 26:7–19.)

  3. Chavez applied his brakes, but upon doing so, the steering wheel locked up and the postal truck began to hydroplane. (T1 at 26:12–20, 36:12–25.)

  4. As Chavez lost control of his vehicle, the postal truck rear-ended Plaintiff's 2012 Scion iQ 2 door Hatchback, which was parked in a parking space outside of

---

[1] To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact. To the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

2

Min's Kitchen restaurant located at 1040 Foothill Boulevard. (Admitted Fact ¶ 5; T1 at 26:23–25, 36:25–40, 48:2–12, 49:11–20, 50:3–12.)

5. Plaintiff, then 49 years old, was sitting in the driver's seat of his car with the ignition off when the Accident occurred. (Admitted Fact ¶¶ 2, 5; T1 at 50:13–17.) Plaintiff was not wearing his seatbelt. (T1 at 50:4–9.)

6. The airbags of Plaintiff's car did not deploy; however, the force of the collision pushed Plaintiff into the steering wheel, causing his left ribcage, left spine, and left hip region to come into contact with objects inside his car. (*Id.* at 51:9–13, 52:2–3.)

7. After the Accident, Plaintiff exited his car from the driver's side, inspected the back of his car, and walked around it while taking photographs and a video of the damage. (*Id.* at 40:14–41:4.)

8. The Accident caused visible damage to the back of Plaintiff's car, as depicted below:

 

(Exs. 2-1, 2-2.)

9. The cost to repair the damage to Plaintiff's car was $4,464.44. (T1 at 57:12–20.)

B. **Plaintiff's Pre-Accident Back and Neck Surgeries**

10. Plaintiff had a history of back and neck surgeries prior to the Accident.

11. In 2004, Plaintiff had spinal decompression surgery at the L5-S1 level. (*Id.* at 177:25–178:2.)

12. In 2014, Plaintiff had a neck fusion surgery, also known as a cervical spinal fusion. (*Id.* at 59:24–60:14, 100:17–20.)

C. **Plaintiff's Post-Accident Medical Care and Injuries**

13. On the evening of December 8, 2019, the day of the Accident, Plaintiff visited the emergency room at USC Verdugo Hills Hospital. (*Id.* at 98:10–13.) The defense's medical expert, Dr. Brian Rudin, testified that the medical report[2] documenting this visit reflects that (i) Plaintiff complained of pain in his neck and back at a severity level of five out of ten; (ii) Plaintiff reported having no numbness, tingling, or radiating pain in his legs;[3] (iii) Plaintiff's physical exam showed no neurologic problems; (iv) Plaintiff's gait was normal; and (v) the range of motion of Plaintiff's spine was reported as "at his baseline" given his history of back and neck surgeries. (*Id.* at 189:19–190:18.) Plaintiff testified at

---

[2] This medical report was not admitted into evidence at trial. However, Dr. Brian Rudin testified that he reviewed this report and relied on its contents in reaching his opinions about Plaintiff's injuries, and so the Court permitted Dr. Rudin to describe the contents of this report on which he relied. (T1 at 187:15–189:13.) To the extent that Plaintiff's counsel disputed the accuracy of Dr. Rudin's account of the report's contents, the Court permitted Plaintiff's counsel to cross-examine Dr. Rudin on this issue. (*Id.* at 189:11–18.)

[3] On cross-examination of Dr. Rudin, Plaintiff's counsel suggested that the language of the medical report documenting this visit is ambiguous as to whether Plaintiff presented with neurologic problems because the report, as read by Plaintiff's counsel, states: "[Plaintiff] rates his neck and lower back pain five out of ten in severity, not radiating, no modifying factors, associated with numbness and tingling to bilateral toes, fingers, and back." (*Id.* at 226:6–11.) Plaintiff's counsel noted that, due to the placement of the comma, one "could read" this statement as indicating that Plaintiff "had associated numbness, tingling to the bilateral toes, fingers and back." (*Id.* at 226:23–25.) Dr. Rudin testified, however, that he read this statement as indicating "no" to "all of the following." (*Id.* at 226:13–11.) Dr. Rudin further noted that his reading was consistent with "the rest" of the medical report, which indicated that Plaintiff's "neurological exam was completely normal" and that Plaintiff's gait was "normal" as well. (*Id.* at 227:3–6.) As Plaintiff's counsel did not dispute the accuracy of the rest of the report's contents as recounted by Dr. Rudin and presented no expert testimony to contradict Dr. Rudin's interpretation of this report, the Court relies on Dr. Rudin's interpretation.

trial, however, that he had started to experience pain, tingling, numbness, and weakness in his left leg before he visited the emergency room and that he was not "walking normally" when he went there. (*Id.* at 58:1–7, 98:15–18.)

14. On December 27, 2019, Plaintiff had an MRI scan of his lumber spine. (Ex. 18-11; T1 at 181:11–25.)

15. Plaintiff later scheduled a consultation with Dr. Jason Berkley, who referred Plaintiff to Dr. Gabriel Hunt, a neurosurgeon at Cedars Sinai. (T1 at 60:24–61:12).

16. Sometime in mid-January of 2020, Plaintiff visited Dr. Hunt and complained of severe left leg pain with persistent numbness radiating down into his left calf and anterior shin. (*Id.* at 61:2–13, 196:1–8.)

17. Since the Accident, Plaintiff has had four surgical procedures on his back, several epidural injections, and a sacroiliac joint injection—all aimed at relieving the pain in his back and the neurologic symptoms he was experiencing in his left leg. (*Id.* at 103:22–105:22.)

18. Dr. Hunt performed the first three of Plaintiff's post-Accident surgical procedures, which were covered by Plaintiff's private health insurance. (*Id.* at 104:13–105:9.) First, on January 22, 2020, Plaintiff had a microdiscectomy at L4-L5. (*Id.* at 61:16–24, 104:10–105:22.) Second, on October 9, 2020, Plaintiff had another microdiscectomy, this time at L4-5 and L5-S1. (*Id.* at 63:23–64:7, 104:10–105:22.) Third, on November 10, 2021, Plaintiff had a spinal fusion procedure at L4-5 and L5-S1. (*Id.* at 203:21–25.) Although Plaintiff experienced some temporary relief from his symptoms following these procedures, the pain, numbness, and tingling in his left leg eventually returned after each one. (*Id.* at 62:21–23, 64:14–18, 70:1–4.)

19. Following the third surgical procedure, Dr. Hunt told Plaintiff that there was nothing more that could be done surgically to relieve Plaintiff's pain. (*Id.* at 105:16–19.) Plaintiff then sought a consultation with a different neurosurgeon, Dr. Andrew Fox. (*Id.* at 69:25–70:9.)

20. Per Dr. Fox's recommendation, Plaintiff had a spinal decompression surgery on November 9, 2022. (*Id.* at 70:10–23, 105:20–21.) Plaintiff underwent this fourth post-Accident surgical procedure on a lien basis, as his private health insurance was cancelled at the time. (*Id.* at 73:9–15, 105:4–9.) After undergoing this spinal decompression surgery, Plaintiff felt "50 percent" relief from his symptoms. (*Id.* at 72:1–3.)

21. Plaintiff testified that his quality of life is far worse now than it was before the Accident. (*Id.* at 78:18–23.) Plaintiff testified that he had no neck pain and no numbness, pain, or weakness in his left leg the day before the Accident. (*Id.* at 85:5–10.) Plaintiff explained that he still suffers from chronic back and left leg pain and that simple daily tasks, such as breathing, eating, walking, and driving, cause him pain. (*Id.* at 78:18–23.)

22. Plaintiff also testified that the Accident and his chronic pain have affected his relationship with his wife and have hindered his ability to engage in certain hobbies, including camping, playing sports with his kids, and traveling. (*Id.* at 78:20–79:23, 81:17–82:25.)

**D. Expert Witness Testimony**

    i. <u>Defense Accident Reconstruction Expert Benjamin Molnar</u>

23. Benjamin Molnar, an engineer with 9 years of experience specializing in vehicle collision reconstruction, inspected Plaintiff's car after it had been repaired, examined an exemplar USPS postal truck, reviewed post-Accident photos of the vehicles, and conducted impact configuration and simulation analyses of the Accident. (*Id.* at 122:2–25, 139:1–12, 45:11–146:9.)

24. Molnar opined that the change in speed experienced by Plaintiff's car at the moment of impact was 6.9 to 7.7. miles per hour and that, as a result, Plaintiff's car was pushed forward approximately 3.7 feet. (*Id.* at 145:11–146:9.)

25. Molnar further opined that the impact experienced by Plaintiff's car was comparable to that of the "average amusement park bumper car ride." (*Id.* at 146:21–23.)

26. The Court found Molnar's testimony credible and reasonably supported, as it was based on his extensive knowledge and experience in accident reconstruction, his investigation of the Accident, and several peer-reviewed articles that measured the accelerations of amusement park bumper car collisions. (*Id.* at 122:2–25, 146:16–23.)

27. Plaintiff presented no expert testimony to rebut Molnar's opinions.

        ii.   <u>Defense Medical Expert Dr. Brian Rudin</u>

28. In May of 2024, Dr. Brian Rudin, a board-certified orthopedic spine surgeon, reviewed Plaintiff's medical records and personally examined Plaintiff. (*Id.* at 167:3–22, 208:13–16.)

29. Based on his review of Plaintiff's pre- and post-Accident imaging, Dr. Rudin opined that Plaintiff has suffered from chronic degenerative disease for approximately the past 20 years. (*Id.* at 177:3–8, 183:21–25, 214:4–6.) Degenerative disc disease causes the discs between spinal vertebrae to degenerate over time. (*Id.* at 170:3–18.) Disc bulges and disc herniations, including spontaneous herniations, are associated with degenerative disc disease. (*Id.* at 171:7–12.)

30. Dr. Rudin also opined that Plaintiff suffered from spinal stenosis prior to the Accident. (*Id.* at 205:19–21.) Spinal stenosis is a condition where bone spurs grow toward the spinal canal and squeeze the nerves, which can cause pain down the legs. (*Id.* at 172:12–17.)

31. Dr. Rudin testified that typical symptoms of a person with degenerative disc disease and spinal stenosis include back pain with radiating pain down the legs, and that this pain may wax and wane or switch sides, depending on the pathology. (*Id.* at 173:1–5.)

32. Dr. Rudin testified that Plaintiff's post-Accident imaging indicates that Plaintiff has "extensive degeneration for someone in their late 40s, early 50s," as nearly all of Plaintiff's spinal discs showed a significant loss of disc height and almost

every level of Plaintiff's spine had bone spurs. (*Id.* at 176:6–23, 177:14–25, 180:11–21.)

33. Dr. Rudin opined that the Accident could not have caused the level of degeneration reflected in Plaintiff's post-Accident imaging; rather, he opined that this level of degeneration occurred over the course of 10 to 20 years—though 20 years seemed more likely given that Plaintiff had a herniated disc at the L5-S1 level back in 2004. (*Id.* at 183:18–25.)

34. Dr. Rudin opined that Plaintiff's post-Accident disc herniation, which his first post-Accident surgical procedure aimed to address, was caused by Plaintiff's chronic disc degeneration and stenosis, not any acute trauma. (*Id.* at 190:16–192:12.) Dr. Rudin explained that when someone has an acute disc herniation, they will typically experience immediate nerve pain (including radiating pain down the legs) and will usually have antalgic gait. (*Id.* at 190:25–191:7.) Dr. Rudin testified that, by contrast, the medical report of Plaintiff's emergency room visit several hours after the Accident reflects that Plaintiff did not complain of leg pain, had no neurologic symptoms, and had a normal gait. (*Id.* at 191:8–192:19.) Dr. Rudin testified, based on his review of Plaintiff's post-Accident medical records, that the first time Plaintiff reported having leg pain to a medical professional was in mid-January of 2020, when Plaintiff went to visit Dr. Hunt. (*Id.* at 61:2–13, 196:1–8.) Dr. Rudin opined that this 5-week delay between the Accident and the onset of Plaintiff's leg pain is inconsistent with an acute disc herniation and instead indicates that Plaintiff's post-Accident leg pain was caused by his chronic disc degeneration disease. (*Id.* at 196:3–19.) Further, Dr. Rudin opined that Plaintiff's post-accident imaging is more consistent with chronic degenerative disc disease than an acute herniation because it shows that Plaintiff's herniation bulges "primarily in the center," whereas acute herniations "are almost all one-sided." (*Id.* at 192:2–12.)

35. Dr. Rudin testified that Plaintiff's 2024 medical imaging of his spine show a new herniation that was not present on a previous 2022 image. (*Id.* at 209:1–

23.) Dr. Rudin opined that this spontaneous herniation further evinces that Plaintiff has chronic degenerative disc disease.

36. Finally, Dr. Rudin opined that, while the Accident did not cause Plaintiff to develop any disc herniations or bulges, the Accident did likely cause Plaintiff to suffer a soft tissue strain in his lower back, which caused pain in Plaintiff's back and neck. (*Id.* at 192:13–193:8, 214:2–15.) Dr. Rudin testified that surgeries and epidural injections would not be recommended treatment for this type of injury; rather, a soft tissue strain would typically resolve on its own with time and would be treated with anti-inflammatory medicines and/or physical or chiropractic therapy. (*Id.* at 192:20–193:8.)

37. On cross examination, Dr. Rudin acknowledged that he has seen patients with acute disc herniation present with "delayed onset of radicular complaints," but explained that this "happens rarely" and is "very atypical." (*Id.* at 222:19–23.)

38. The Court found Dr. Rudin's testimony and opinions credible and reasonably supported, as they were based on his experience as an orthopedic surgeon and knowledge of the field, review of Plaintiff's pre-and post-Accident medical records and imaging, and examination of Plaintiff. Dr. Rudin's concessions that the Accident likely caused Plaintiff to suffer a soft tissue sprain in his back and that it is possible, though highly unlikely, for a patient with acute disc herniation to present with delayed onset of radiating pain strengthened Dr. Rudin's credibility. The Court also found that Dr. Rudin's opinions stayed consistent throughout direct and cross-examination.

39. Plaintiff presented no medical expert testimony at trial to rebut Dr. Rudin's opinions.

### E. Credibility Concerns with Plaintiff's Testimony

40. The Court found credibility issues with Plaintiff's testimony that undermine the weight of his subjective complaints.

41. A particularly striking example is that Plaintiff testified on direct examination that he had not been involved in "any car crashes" between 2008 and December

9

8, 2019, the date of the Accident, yet Plaintiff conceded on cross-examination that he had been involved in another motor vehicle accident on April 1, 2019. (*Id.* at 85:19–21, 112:9–113:22.) This prior accident occurred while Plaintiff was driving his son's truck in Pismo Beach. (*Id.*) Plaintiff described it as a "little" accident where he drove into a "little" culvert after swerving to avoid a deer. (*Id.* at 109:22–110:2.) On further examination and when confronted with insurance records, Plaintiff acknowledged that his son's truck was in the body shop for three to four months and was ultimately declared a total loss as a result of the accident, with the cost of repairs estimated at about $39,000. (*Id.* at 112:15–22; 115:9–18.) Further eroding the credibility of Plaintiff's testimony is that, when Plaintiff was asked on cross-examination why he neither informed his treating physicians (*i.e.*, Dr. Hunt and Dr. Fox) about the April 1, 2019 motor vehicle accident nor disclosed it to defense counsel during his deposition on May 9, 2024, Plaintiff stated that the prior accident "completely slipped [his] mind." (*Id.* at 113:12–16.)

42. There were also inconsistencies in Plaintiff's testimony as to when he began to experience certain symptoms and the extent to which his post-Accident injuries have affected his ability to participate in certain activities. For instance, as noted above, Plaintiff testified at trial that he was experiencing pain, tingling, and numbness in his left leg and was not "walking normally" when he went to USC Verdugo Hills Hospital's emergency room on the evening of the Accident. (*Id.* at 57:25–58:9, 98:15–19.) But during his deposition on May 9, 2024, Plaintiff testified under oath that his "walking was okay" and "normal" when he went to USC Verdugo Hospital's emergency room. (*Id.* at 99:19–100:10.) Moreover, Plaintiff testified at trial on direct examination that (1) aside from taking separate trips to Germany, North Carolina, and Miami, he had not traveled since the Accident and (2) he has had difficulty driving since the Accident, noting that it "hurts [his back] to touch the accelerator or the brake pedal." (*Id.* at 81:17–83:20, 106:12–22.) Yet Plaintiff admitted on cross-

examination that, in 2021, he drove a mobile home to Phoenix, Arizona to attend a music festival; this trip entailed a 7-hour drive. (*Id.* at 106:12–108:4.)

43. For these reasons, the Court finds that Plaintiff's credibility is undermined. Thus, as a general matter, the Court attributes less weight to Plaintiff's subjective complaints. However, to the extent that Plaintiff's subjective complaints conflict with the credible testimony of Dr. Rudin and are unsupported by any evidence other than Plaintiff's own testimony—*e.g.*, Plaintiff's testimony that he was experiencing pain, tingling, and numbness in his left leg and was not walking normally when he went to the emergency room on the evening of the Accident—the Court concludes that such complaints lack veracity and therefore gives them no weight.

## III. CONCLUSIONS OF LAW

### A. Liability

43. Plaintiff asserts a single claim for violation of the FTCA alleging that Chavez negligently operated his vehicle, resulting in Plaintiff's injuries. (Compl., Doc. 1.)

44. Under the FTCA, "district courts … have exclusive jurisdiction of civil actions or claims against the United States … for … personal injury … caused by the negligent or wrongful act or omission of any employee of the Government while acting in the scope of his office or employment." 28 U.S.C. § 1346(b)(1). Here, Chavez was a government employee acting within the scope of his employment with the USPS when his postal truck rear-ended Plaintiff's vehicle.

45. To establish negligence under California law,[4] Plaintiff must prove "(a) a legal duty to use due care, (b) a breach of that duty, and (c) that the breach was the proximate or legal cause of the resulting injury." *Ladd v. Cty. of San Mateo*, 12 Cal. 4th 913, 917 (1996) (cleaned up).

---

[4] Because the Accident occurred in California, California law governs Plaintiff's claim. *Molzof v. United States*, 502 U.S. 301, 305 (1992); 28 U.S.C. §§ 1346(b)(1), 2674.

11

i. <u>Duty and Breach of Duty</u>

46. The Court concludes—and Defendant does not dispute—that Chavez owed Plaintiff a duty of care and breached that duty. Chavez had a duty to use ordinary care in the operation of his postal truck. *See Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764, 771 (2011) ("[E]ach person has a duty to use ordinary care and 'is liable for injuries caused by his failure to exercise reasonable care in the circumstances.'") (citation omitted). Moreover, the undisputed facts of this case, showing among other things that Plaintiff's vehicle was parked when it was rear-ended by Chavez's postal truck, are amply sufficient to justify the application of the *res ipsa loquitur* doctrine, and consequently a presumption of negligence that Defendant bears the burden to rebut. *See Beck v. Kessler*, 235 Cal. App. 2d 331, 337 (1965) ("Particularly in those situations where the rear car has collided with a stopped or stationary vehicle, the courts have applied the doctrine of *res ipsa loquitur* and have held that an inference arises that the collision was caused by some negligent conduct on the part of the driver of the rear car, which the latter was thereupon required to rebut."); *see also Gagosian v. Burdick's Television & Appliances* 254 Cal. App. 2d 316, 318 (1967) ("The doctrine of res ipsa loquitur applies unconditionally, or 'as a matter of law,' when undisputed evidence establishes that plaintiff's car was stationary when struck from behind by defendants' vehicle[.]"). Defendant, having presented no argument that Chavez was exercising ordinary care when the accident occurred, has failed to rebut the presumption that Chavez was negligently operating his postal truck. *See Slappey v. Schiller*, 116 Cal. App. 274, 277 (1931) (explaining that the doctrine of *res ipsa loquitur* "raises a presumption of the defendant's negligence, and casts upon the defendant the burden of showing that ordinary

care was exercised") (citation omitted).  Thus, Plaintiff has established that Chavez breached the duty of care he owed to Plaintiff.

    ii. Causation

47. "Plaintiff must prove by a preponderance of the evidence a causal connection between [Chavez's] negligence and [his] injuries." *Pedroza v. United States*, 2021 WL 4441974, at *5 (C.D. Cal. Sept. 27, 2021) (citing *Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1052 (1991), and *Skinner v. Vacaville Unified Sch. Dist.*, 37 Cal. App. 4th 31, 42 (1995)).

48. "Causation is established for purposes of California tort law if the defendant's conduct is a substantial factor in bringing about the plaintiff's injury." *Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.*, 5 Cal. 5th 216, 223 (2018), *as modified* (July 25, 2018) (internal quotation marks omitted).

49. "A tortfeasor must take a plaintiff as []he is—even if, by reason of some preexisting condition, the plaintiff is more susceptible to injury than an ordinary person and incurred more harm because of the defendant's conduct than an ordinary person would." *Id.* (citing *Rideau v. Los Angeles Transit Lines*, 124 Cal.App.2d 466, 471 (1954)).  However, "[a] tortfeasor is not liable for a plaintiff's pre-existing conditions or the natural progression of those conditions." *Lewis v. United States*, 2017 WL 2311874, at *6 (C.D. Cal. May 24, 2017) (citing *Whyatt v. Kukura*, 157 Cal. App. 2d 803, 805 (1958), and *Carruthers v. Cunha*, 133 Cal. App. 2d 91, 96 (1955)).  Thus, the burden is on the plaintiff to prove that it is more likely than not "that his damages were caused by the tort and would not have occurred anyway because of his pre-existing conditions." *Id.* (citation omitted).

50. The Court concludes that Chavez's negligence was a substantial factor in causing some, but not all, of Plaintiff's claimed injuries.

51. The evidence establishes that Chavez's negligence was a substantial factor in causing damage to the back of Plaintiff's 2012 Scion iQ2 door Hatchback. (T1 at 57:12–20.)

52. The evidence also establishes that Chavez's negligence was a substantial factor in causing Plaintiff to suffer a low back strain, which caused pain in his back and neck. (*Id.* at 192:13–193:8, 214:2–15.)

53. However, Plaintiff did not meet his burden of proof in establishing that any other injuries he experienced after the Accident—*i.e.*, his herniated spinal discs and bulges, spinal degeneration, and any neurologic issues or pain arising therefrom—were caused by Chavez's negligence, let alone that Chavez's negligence was a substantial factor in bringing about such injuries. As explained in detail in the Findings of Fact section above, Dr. Rudin opined—based on his review of Plaintiff's pre- and post-Accident medical imaging, his review of Plaintiff's medical reports, and his examination of Plaintiff—that Plaintiff's post-Accident herniated spinal discs and bulges and spinal degeneration were caused by Plaintiff's pre-existing chronic disc degeneration disease and spinal stenosis. (*Id.* at 176:15–23, 177:14–178:2, 180:11–21, 183:18–25, 190:16–192:12, 196:3–19, 209:12–23.) Dr. Rudin further opined that it is highly unlikely that the Accident caused Plaintiff to suffer from an acute disc herniation, because the medical report from Plaintiff's emergency room visit several hours after the Accident shows that Plaintiff had no neurologic issues and normal gait, and because Plaintiff's post-Accident medical imaging is more consistent with chronic degenerative disease than acute disc herniation. (*Id.* at 174:23–175:6, 190:16–192:12.) Lastly, Dr. Rudin opined that the low back strain caused by the Accident would likely have resolved on its own within a number of weeks, and that neither spinal surgeries nor epidural injections would have been recommended as treatment for a low back strain. (*Id.* at 192:13–193:2.) Plaintiff presented no medical expert testimony to rebut Dr. Rudin's opinions, and, for the reasons set forth in the Findings of Fact section, the Court found Dr. Rudin's opinions to be both credible and reasonably supported. Accordingly, Plaintiff failed to establish by a preponderance of the evidence that his post-Accident back injuries—with the exception of his low

back strain and any pain arising therefrom—were caused by Chavez's negligence.

**B. Damages**

    i. Property Damage

53. Plaintiff has proven that he is entitled to recover the cost to repair the damage to his 2012 Scion iQ2 door Hatchback caused by the Accident, which amounts to $4,464.44. (T1 at 57:12–20.)

    ii. Economic Damages: Past Medical Expenses

54. California law permits a plaintiff to recover for past medical expenses that were both actually incurred and reasonable. *Howell v. Hamilton Meats & Provisions, Inc.*, 52 Cal. 4th 541, 555 (2011). "To recover for past medical expenses, a plaintiff must prove: (1) the amount of each expense; (2) that each of the charges was reasonable; (3) that each of the services was actually given, and was reasonably necessary to diagnose and treat the injuries; and (4) that the condition which necessitated the treatment was the legal result of the injury caused by the defendant." *Peltier v. United States*, 2017 WL 4621544, at *4 (C.D. Cal. Oct. 16, 2017) (citing *Ochoa v. Dorado*, 228 Cal. App. 4th 120, 137 (2014)).

55. Plaintiff seeks $360,000 in past medical expenses—the amount that Plaintiff purportedly owes in medical bills for the fourth post-Accident spinal surgery that he underwent on a lien basis. (T1 at 74:12–14; P's Proposed Findings of Fact and Conclusions of Law at 22.)

56. Because Plaintiff did not establish by a preponderance of the evidence that the spinal injuries warranting his post-Accident spinal surgeries were caused by Chavez's negligence, Plaintiff is not entitled to recover past medical expenses he incurred in undergoing those surgeries.[5] *See Peltier*, 2017 WL 4621544, at *4.

---

[5] The Court also notes that Plaintiff has not met his burden to show that $360,000 is a reasonable amount for the services rendered while he was uninsured. While the amount billed by a medical provider is relevant to this inquiry, a "medical care provider's billed price for particular services is not necessarily representative of either the cost of providing those services or their
    (footnote continued)

57. As to the injuries that were caused by the Accident—*i.e.*, Plaintiff's low back strain and pain arising therefrom—Dr. Rudin opined that these injuries likely would have resolved on their own within a number of weeks after the Accident. (T1 at 192:13–193:2). Plaintiff has presented no evidence or argument indicating that he incurred any medical expenses attributable to these injuries.

58. Accordingly, the Court declines to award Plaintiff past medical expenses.

### iii. Economic Damages: Future Medical Expenses

59. A plaintiff may recover future medical expenses if he establishes "that from all the evidence, including the expert testimony, if there be any, it satisfactorily appears that such disability will occur with reasonable certainty." *Garcia v. Duro Dyne Corp.,* 156 Cal. App. 4th 92, 97–98 (2007). "Future damages should not be awarded if they are speculative." *Cantu v. United States*, 2015 WL 4720580, at *28 (C.D. Cal. Aug. 7, 2015) (citing Cal. Civ. Code § 3283).

60. The Court finds that to the extent Plaintiff may need medical care in the future, it is speculative and not causally related to the accident. Indeed, even Plaintiff's post-trial submission describes his need for future treatment as "uncertain[]." (Pl's Proposed Findings of Fact and Conclusions of Law at 23.) Therefore, Plaintiff is not entitled to damages for future medical expenses.

### iv. Non-Economic Damages

61. "In California, a plaintiff who has established liability may recover noneconomic damages for a wide variety of harms, including emotional distress and pain and suffering, which may include not only physical pain but also 'fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal.'" *Seferaj v. United States*, 2023 WL 5530026, at *6 (C.D. Cal. Aug. 28, 2023) (quoting *Capelouto*

---

market value." *Ochoa*, 228 Cal. App. 4th at 135. "The uninsured plaintiff also must present additional evidence, generally in the form of expert opinion testimony, to establish that the amount billed is a reasonable value for the service rendered." *Pebley v. Santa Clara Organics, LLC*, 22 Cal. App. 5th 1266, 1275 (2018). Here, Plaintiff has presented no expert testimony or other "additional evidence" to establish the reasonableness of the $360,000 he seeks to recover.

16

*v. Kaiser Found. Hosps.*, 7 Cal. 3d 889, 892–93 (1972)). The test for determining noneconomic damages "is one of reasonable compensation." *Hilliard v. A. H. Robins Co.*, 148 Cal. App. 3d 374, 412 (1983). A plaintiff may recover for future noneconomic damages that are reasonably certain to occur. *Garcia v. Duro Dyne Corp.*, 156 Cal. App. 4th 92, 97 (2007).

62. The Court finds Plaintiff's proposal of $3,140,000 in past non-economic damages to be excessive and unsupported. (Pl's Proposed Findings of Fact and Conclusions of Law at 22.) Nonetheless, Plaintiff is entitled to recover damages for the pain and suffering attributable to the low back strain he suffered due to Chavez's negligence. Although this soft tissue injury likely resolved within a number of weeks after the Accident, Plaintiff testified that the pain he experienced during those weeks prevented him from engaging in certain activities, affected his relationship with his wife, and caused him emotional distress. (T1 at 78:18–23, 192:13–193:2). Having considered the evidence presented, and having reviewed other cases as benchmarks,[6] the Court concludes that $15,000 is a reasonable amount for past non-economic damages in this case.

63. Lastly, the Court declines to award Plaintiff future non-economic damages, as any award of future non-economic damages would be speculative and unsupported.

IV. **CONCLUSION**

For the above reasons, the Court concludes that Plaintiff's damages include $4,464.44 in property damages and $15,000 in past non-economic damages, for a total of

---

[6] *See, e.g.*, *Peltier*, 2017 WL 4621544, at *2, 5 (awarding $2,500 in non-economic damages for back pain, suffering, and anxiety stemming from minor rear-end collision); *Seferaj*, 2023 WL 5530026, at *6 (awarding $18,000 in non-economic damages for back, neck, and leg pain that had continued several years after an accident where a postal truck struck plaintiff's driver door and injured Plaintiff); *Madrigal v. United States*, 2021 WL 3589328, at *5 (C.D. Cal. Aug. 13, 2021) (awarding $40,000 in non-economic damages for pain, suffering, and loss of ability to hike or travel as plaintiff did before the accident, which exacerbated plaintiff's pre-existing spinal injuries); *Cantu*, 2015 WL 4720580, at *2–5, 13–15, 36 (awarding $15,000 in non-economic damages for past mild back, neck, and shoulder pain stemming from a moderately severe collision where plaintiff's automobile spun clockwise and rolled onto its roof).

$19,464.44.  The Court ORDERS the parties to prepare and submit a Proposed Judgment consistent with this Order.  The Proposed Judgment shall be submitted within **seven (7) days** of the issuance of this Order.

DATED:  May 20, 2025

_____
**JOSEPHINE L. STATON**
HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE